[ PHILADELPHIA, MAY 2D, 1840. ]


## Estate of DAVIS and DESAUQUE.


### APPEAL.


1. Where the separate note of one partner is taken by a creditor holding the note of the firm, it is a question of intention, whether this amounts to an extinguishment of the joint debt. The *onus* of showing that it is an extinguishment lies upon those who allege it ; and it is necessary for them to show a special contract to that effect, or that the joint note was given up; and even where that is the case, the presumption may be rebutted by countervailing proof.

2. After the dissolution of a partnership by agreement, the partner who is authorised to settle the estate, may borrow money on the credit of the firm, for the purpose of paying the debts of the firm ; and if the credit is given in good faith, though with a knowledge of the dissolution, and the money is faithfully applied to the liquidation of the joint debts, the creditor has a claim against the firm, and is not to be considered as a creditor merely of the partner borrowing.

3. A. and B., partners, dissolved the partnership, B. remaining to settle the business, and shortly afterwards A. & B. made an assignment of the partnership effects to C. and D. The assignment contained a preference to C. for a certain sum, " being the amount of accommodation notes or paper and liabilities or responsibilities, and of borrowed money for and on account of the late firm." It appeared that the firm was indebted to C. on three notes, which fell due after the dissolution and before the assignment, and for which new notes were given by C., who received the notes of B. for the same amount: The original notes remained in the hands of C. Between the time of the dissolution and assignment, B. borrowed money of C. for the purpose of paying other debts of the firm, and the money was so applied. *Held,* that C. was entitled to retain the amount for which he was preferred in the assignment, and which included the three notes and borrowed money.

4. Where assignees for the benefit of creditors sold some of the goods at private sale, and delivered them to the purchaser, who failed to pay, it was *held,* that they were chargeable with the amount; it appearing that the credit of the vendee was doubtful, and that the assignors had refused to trust him before the assignment.


THIS was an appeal from a decree of the Court of Common Pleas for the City and County of Philadelphia, in the matter of the accounts of Lewis Desauque and Thomas Taylor, assignees of Nathaniel Davis and Francis Desauque.

In the Court below the accounts were referred to auditors, who made a report, stating the material circumstances of the case, as follows:

(Estate of Davis & Desauque.)

" The objections taken by the opposing creditors were as follows:

1. That the assignees were not entitled to claim an allowance for the per centage claimed by them in the shape of guarantee and discount on the sales of stock at public auction and otherwise.

2. That the assignees should be charged with an additional sum per cask, for the wine purchased and taken by one of them.

3. That the assignees should be charged with the amount of a sale made by them to one Stork, for cash.

4. That the assignees were not entitled to an allowance for certain sums retained by them as preferred debts under the assignment.

For the purpose of enabling the Court fully to understand the last of these objections, the auditors report the following facts:

Nathaniel Davis and Francis Desauque, a son of one of the assignees, entered into a partnership, as wine merchants. This partnership was dissolved on the 16th of October, 1830, Nathaniel Davis quitting the concern and leaving Francis Desauque in possession of the store and stock. Francis Desauque was to wind up the business. At the time of the dissolution, certain notes given by the partnership to Lewis Desauque and Thomas Taylor, (the assignees) were outstanding. These notes constitute the preferences mentioned in the assignment. The wine business was continued by Francis Desauque in the same store, and with the same stock, until the 16th of November, 1830; when the assignment was made to the parties whose accounts are submitted. There was also an assignment made about the same time by Francis Desauque of his individual property.

The assignment by the partners contains, among others, this clause:

' That the said assignees shall and will pay unto Lewis Desauque the sum of eleven thousand three hundred and ninety-six dollars, being the amount of accommodation notes or paper and liabilities or responsibilities, and of borrowed money for and on account of the said late firm of Davis and Desauque; and in the third place shall and will pay unto the said Captain Thomas Taylor the sum of two thousand nine hundred and seventy dollars and sixty-one cents, deducting the amount of a shipment of flour to St. Thomas, transferred to him by them, being the amount of accommodation paper for which he is liable or responsible for them.'

During the month that intervened between the dissolution of the partnership and the assignment by the late partners, Francis Desauque obtained from Lewis Desauque five hundred dollars, on two checks, one dated the 12th and the other the 15th of November, 1830. These five hundred dollars are embraced by the preference.

Mr. Newlin, the clerk in the store, deposed as to the getting of the five hundred dollars. He also deposed that the five hundred dollars went to lift the notes of Davis and Desauque, falling due after the dissolution, although the entry of this sum was made in F.

Desauque's cash book; and that F. Desauque went on doing business on his own account at the same time he was winding up the affairs of Davis and Desauque. Francis Desauque, he further stated, opened a new set of books, in which he entered all sales made by him. In fine, it did not appear, that Francis Desauque, for the month he continued in the business, made any distinction between his own and the partnership property, but mixed up the whole business.

The balance of the preference to Lewis Desauque was made up of the following promissory notes:

One dated June 19th, 1830, at four months, for three thousand dollars. Drawers, Davis and Desauque, payee, Lewis Desauque. This note fell due the 19th–22d of October, 1830, after dissolution and before assignment. It was taken up by L. Desauque by his note at four months for the same amount to F. Desauque; receiving at the same time F. Desauque's note, at the same payment, for the same sum.

One other, dated August 4th, 1830, at ninety days, for two thousand nine hundred dollars. Drawers, Davis and Desauque; payee, Lewis Desauque. It fell due the 2d–5th of November, was taken up, and notes passed in like manner.

One other, dated July 1st, 1830, at four months: drawers, Davis and Desauque; payee, Lewis Desauque. Due the 1st–4th of November, 1830; arranged in like manner. This was for two thousand dollars.

One other, dated September 9th, 1830; at six months, nineteen hundred and ninety-six dollars and thirteen cents. Drawer, F. Desauque; payees, L. Desauque and Son. Though this note bears date as of a day before the dissolution, in point of fact it was not given until after, and for money said to have been borrowed at the time to aid in lifting notes of the firm as they became due. This was deposed to by Mr. Newlin, the clerk.

One other, dated September 6th, 1830, at four months, for one thousand dollars. Drawers, Davis and Desauque; payee, Lewis Desauque. There was no difficulty as to this note.

The preference in favour of Taylor originated upon notes; one only of which was placed under the like circumstances. It is not deemed necessary to particularize the items of his claim, as the principle of the objection taken can be readily understood from the facts already stated.

The auditors are of opinion that there is nothing in the exceptions. They had no difficulty in coming to a conclusion on the three first. The guaranty and discount paid and allowed, was in the usual course of trade, and consistent with the duties which the assignees had to perform. The purchases made by them were at fair prices and in good faith. Better terms could not be had from strangers. Indeed, it was sufficiently in proof that they used every effort to sell

(Estate of Davis & Desauque.)

to others before they ventured to buy themselves. The sale to Stork was also in good faith. It is not certain that the estate will sustain any loss by this transaction: granting that it must be so, the assignees are not liable. No such laches were proved as would justify a charge of the amount against them.

The fourth objection required more deliberation, and more was given to it by the auditors. On the one hand it was contended, that the giving of notes and borrowing of money after the dissolution, and before the assignment, were to be regarded as the individual transactions of Francis Desauque; that Lewis Desauque and Son, in whose favour the note for nineteen, hundred and ninety-six dollars and thirty-one cents was drawn, were not preferred under the assignment; that a new credit was given to Francis Desauque by the subsequent arrangements between him and his father, and Captain Taylor; and their original debts by that means extinguished, so that they could have no claim for such on the partnership effects: while on the other it was maintained that the money was borrowed for the purpose of settling up the partnership business; that the notes given by Francis Desauque were merely evidences of renewals not amounting to payment of the others, and were not so intended; that the original securities were not given up; that the partners were liable at the time of the dissolution for the whole amount preferred; that they recognised their liability at the making of the assignment by providing for the payment of the notes and checks; and finally, that they had the right so to appropriate their property. A number of authorities were cited, and their principles examined by the auditors. The result of their investigation is with the accountants. They may be wrong in their opinion; if so, the Court can set them right. As they adopt the principles urged by the counsel for the assignees, they do not deem an enlargement upon them necessary."

Exceptions were filed to this report, but the Court of Common Pleas overruled them and confirmed the report of the auditors. An appeal was then taken to this Court, and the following exceptions filed.

" 1. The Court erred in not charging the assignees with the sum of two hundred and ninety-two dollars and fifty cents, the value of the goods delivered by them to Stork.

2. The Court erred in allowing the accountants a credit for the amount of the note, dated the 19th of June, 1830, at four months, for three thousand dollars, paid by a note dated the 19th of October, 1830, drawn by Lewis Desauque, in favour of Francis Desauque, for three thousand dollars, at four months.

3. The Court erred in allowing them a credit for the amount of the note, dated the 4th of August, 1830, at ninety days, for two thousand nine hundred dollars, paid by a note dated the 29th of

(Estate of Davis & Desauque.)

October, 1830, at ninety days, drawn by Lewis Desauque in favour of Francis Desauque, for two thousand nine hundred dollars.

4. The Court erred in allowing them a credit for the amount of the note, dated July 1st, 1830, at four months, for two thousand dollars, paid by a note dated November 1st, 1830, drawn by Lewis Desauque in favour of Francis Desauque, for two thousand dollars, payable in four months.

5. The Court erred in allowing a credit for the amount of the note drawn by Lewis Desauque & Son, in favour of Francis Desauque, dated the 9th of September, 1830, at six months, for nineteen hundred and ninety-six dollars and thirteen cents.

6. The Court erred in allowing a credit for the sum of five hundred dollars to Lewis Desauque, borrowed money.

7. The Court erred in allowing any credit on account of a note dated June 25th, 1830, at four months, for one thousand and three dollars and thirty cents, paid by a note drawn by Thomas Taylor, in favour of Francis Desauque, dated October 22d, 1830, at sixty days, for nine hundred and ninety-five dollars and sixty cents."

The following testimony appears by the paper book to have been taken before the auditors.

Thomas Taylor having been sworn, deposed before the auditor according to the notes of S. Keemlé, among other things relative to the preferences as follows:

" The note of one thousand dollars and thirty cents was taken up by F. Desauque with my note for nine hundred and ninety-five dollars and sixty-four cents; Mr. Desauque was left to wind up the concerns, and I gave it to him, with which he took up the other, paying the difference.

This note (one thousand and eighteen dollars and sixty-one cents) was paid and taken up by me; we had no dealings before the notes were lent by me, nor any except my lending them notes and money; Mr. Desauque said he had received so many accommodations from his father towards winding up the concerns of Davis and Desauque, that he could not ask any more, and in fact he did not know if any would be done more."

Charles L. Desauque deposed before the auditor, according to the notes of S. Keemlé, in relation to the same subject, as follows:

" I would state as to the note of nineteen hundred and ninety-six dollars and thirteen cents, that at the time it was borrowed, which was to the best of my knowledge from the 1st to the 9th of November, 1830, after the dissolution, when F. Desauque requested to be accommodated to about the amount of two thousand dollars, and he

said it was for the purpose of liquidating the concerns of Davis and Desauque, the demands of which were coming in fast since the dissolution—Davis not present—it was understood that L. Desauque only was responsible for it, and be considered as if signed by him alone; I would charge it to him; he had enough of his own paper out on that concern already, and did not wish to have more; it was dated some time back; we do these things to give it a business appearance; I signed it.

As to five hundred dollars lent money, I believe there were two checks of two hundred dollars and three hundred dollars; one of two hundred dollars was dated the 12th of November, 1830, in favour of F. Desauque, signed by L. Desauque; 15th of November, 1830, for three hundred dollars, drawn and signed in the same way and in the same favour. I considered it was for the concerns of Davis and Desauque, for I did not know how they could so much other debts since the dissolution, and they were more pressed then than at any other time."

Mr. Newlin also deposed—

"There was a good deal of Davis and Desauque's paper becoming due after dissolution, and we borrowed of L. Desauque; borrowed by F. Desauque. It was borrowed for the purpose of lifting the paper of Davis and Desauque. I believe there was some borrowed at the same time from other persons, for the same purpose, Mr. Bridges and one or two others, I will not be certain as to the persons; that note of nineteen hundred and ninety-six dollars and thirteen cents also went to take up the same paper; to take up business and some other paper, some accommodation paper. All the notes that have been read this evening are correct; these notes were originally for the accommodation of Davis & Desauque; F. Desauque went on to wind up the concerns of Davis & Desauque after the dissolution; my memory does not serve me if I went to borrow these checks; I can't say I saw them borrowed; I know there was a balance due L. Desauque at the time of assignment of five hundred dollars, which will be found in F. Desauque's book, which was appropriated however for lifting this paper; the nineteen hundred and ninety-six dollars and thirteen cents was also entered in F. Desauque's cash book; knows nothing of the two checks except from course of business. F. Desauque continued to do business as before; he did business before on his own account; he afterwards made an assignment in favour of Bridges. I can't recollect if I received these checks; no written agreement to dissolve; does not know the time of dissolution. F. Desauque retained all the property of Davis & Desauque; he continued to make sale of it during the month he did business. He opened a new set of books at dissolution; the entry of sales of Davis & Desauque were made in books of F. Desauque; no distinction was made in the entries;

(Estate of Davis & Desauque.)

dissolution was announced; but Davis & Desauque had no written agreement; no account of stock was taken; it was all mixed up. I remained with him till the assignment. Some account was taken of what belonged to Davis & Desauque, and to F. Desauque the day after the assignment.

[The original counter notes given by Davis & Desauque, were retained by L. Desauque.]

Charles F. Desauque, (according to the notes of A. Randall, Esq.) "There was a sale to Stork through a broker, one hundred and fifty-four cases of claret, at one dollar and ninety-five cents per case. There is a suit against J. F. Lewis for it. It was a cash sale, so called. Assignees have received no part of it.

Francis D. requested this note of two thousand dollars of Lewis Desauque. He (F. D.) stated it was for the purpose of liquidating the concerns of Davis & Desauque. Davis not present; he had nothing to do with it."

Cross-examined—"Arrangements made between Francis Desauque, Lewis Desauque and myself; counter note of Francis Desauque in favour of Lewis Desauque & Son."

The following deposition appears to have been taken after the appeal to the Supreme Court.

"James W. Newlin, being duly sworn in behalf of the appellants, doth depose and say, that he was clerk to Davis & Desauque, and after the dissolution of co-partnership, was clerk to Francis Desauque, up to the time of the assignment: that Lewis Desauque accommodated them with his paper before the dissolution, and the renewal of those notes after the dissolution: that at the time Lewis Desauque lent his notes, there were counter notes given to him: that when these notes were renewed by Lewis Desauque, he gave up the counter notes which he held. The notes were always regularly exchanged."

Being cross-examined by Samuel H. Keemlé, Esq., he saith, "That when a note of Lewis Desauque's was taken up, it was handed to him, and the counter note returned to Davis & Desauque: that what he has said relates to the notes which were paid and taken up: that he does not know what became of the notes due after the assignment: that he presumes the notes given by Davis & Desauque before the dissolution, which became due after the dissolution, were retained by Lewis Desauque; but he cannot say: that when he speaks in his examination in chief of notes exchanged between Lewis Desauque and Davis & Desauque, they were notes which were taken up by Davis & Desauque—paid regularly in bank the same as another note; but they were renewals of the former notes: that he can't say whether the notes of Davis & Desauque, given before the dissolution, and becoming due after the dissolution, and before the assignment, were retained or not

by Lewis Desauque: that he knows nothing on that subject." Being re-examined in chief, he says, "That to his recollection, there was no change in the practice of giving counter notes after the dissolution: that he knows nothing on the subject, whether it was continued or not."

Mr. *Randall*, for the appellants, cited *Evans* v. *Drummond*, (4 *Esp. Rep.* 90.) *Sheepshanks* v. *Cohen*, (14 *Serg. & Rawle*, 35.) 3 *Esp. Rep.* 108.    5 *Esp. Rep.* 122.    *Emily* v. *Lye*, (15 *East*, 7.) *Wrightson* v. *Pullan*, (1 *Starkie's Rep.* 375; 2 *Eng. Com. Law Rep.* 435.)    *Wright* v. *Pulham*, (2 *Chitty's Rep.* 121 ; 18 *Eng. Com. Law Rep.* 271.)    *Gow on Part.* 165, 169, 210.    *Byles on Bills*, 25.    *Vere* v. *Ashby*, (10 *Barn. & Cres.* 288; 21 *Eng. Com. Law Rep.* 79.)    *Anderson* v. *Henshaw*, (2 *Day*, 272.)    *Le Roy* v. *Johnson*, (2 *Peters*, 186.)    *Milligan* v. *Brown*, (1 *Rawle*, 391.)    *Graeff* v. *Hitchman*, (5 *Watts*, 454.)    *Harris* v. *Lindsay*, (4 *Wash. C. C. Rep.* 276.)

Mr. *Keemlé* and Mr. *J. R. Ingersoll*, contra, cited *Harland's Case*, (5 *Rawle*, 323.)    *David* v. *Ellice*, (5 *Barn. & Cres.* 196; 11 *Eng. Com. Law Rep.* 201.)    *Lodge* v. *Dicas*, (3 *Barn. & Ald.* 611; 5 *Eng. Com. Law Rep.* 397.)    *Gough* v. *Davis*, (4 *Price*, 200; 2 *Eng. Exch. Rep.* 81.)    *Drake* v. *Mitchell*, (3 *East*, 250.)    *Puckford* v. *Maxwell*, (6 *Term Rep.* 52.)    *Clark* v. *Young*, (1 *Cranch*, 181.)    *Sheehy* v. *Mandeville*, (6 *Cranch*, 264.)    *Bank U. States* v. *Daniel*, (12 *Peters's Rep.* 32.)    *Lukens* v. *Packer*, (2 *Hall's Rep.* 547.)    *Arnold* v. *Camp*, (12 *Johns.* 411.)    *Smith* v. *Rogers*, (17 *Johns.* 340.)    *Eaton* v. *Taylor*, (10 *Mass. Rep.* 54.)    *Barker* v. *Blake*, (11 *Mass. Rep.* 16.)    *Tyson* v. *Pollock*, (1 *Penn. Rep.* 380.) *Hacker* v. *Perkins*, (*Ante. p.* 95.)    *Wallace* v. *Fairman*, (4 *Watts*, 378.)    *Leas* v. *James*, (10 *Serg. & Rawle*, 307.)    *Bank of Columbia* v. *Patterson*, (7 *Cranch*, 299.)    3 *Campbell*, 478.    *Gow on Partnership*, 63, 312, 322.    *Wells* v. *Ross*, (7 *Taunt.* 403; 2 *Eng. Com. Law Rep.* 154.)    *Exparte Walker*, (4 *Ves.* 373.)    *Doner* v. *Stauffer*, (1 *Penn. Rep.* 198.)    *Kean* v. *Dufresne*, (3 *Serg. & Rawle*, 233.)

The opinion of the Court was delivered by

ROGERS, J.—It is generally true, that the giving a note for a pre-existing debt, does not discharge the original cause of action, unless it is agreed that the note shall be taken in payment. 12 *Peters*, 59. 6 *Cranch*, 264.    And although it is decided in *Evans* v. *Drummond*, (4 *Esp.* 90,) that taking a security from one of several partners, joint makers of a promissory note or acceptors of a bill, will discharge the other co-partners, yet in a subsequent case, *Bedford* v. *Deakin*, (2 *B. & A.* 210,) it is held, that where one of three partners, after a dissolution of partnership, undertook to pay a particular partnership debt, on two bills of exchange, and that was communi-

cated to the holder, who consented to take the separate notes of one partner for the amount, strictly reserving his right against all three, and retained possession of the original bill, the separate notes having proved unproductive, he might resort to his remedy against the other partners; and that the taking under these circumstances, the separate notes, and even afterwards renewing them several times successively, did not amount to a satisfaction of the joint debt.

In *Evans* v. *Drummond* it does not appear whether the joint bill of exchange was given up; but in *Bedford* v. *Deakin* the fact is stated, and is one of the grounds of the decision.   Whether taking the separate note of one of the partners amounts to an extinguishment or satisfaction of a joint debt, depends upon the intention of the parties; and in the absence of all proof of a special contract, the giving up or the retention of the original security, will in general be a decisive circumstance; for it is difficult to account for the fact, except on the supposition that in the one case it was intended, in case of need, to enforce the joint liability; or, in the other, to depend altogether upon the responsibility of one of the joint debtors.   Where a joint debtor insists that the separate note is substituted, and is in satisfaction of the joint debt, the onus is thrown upon him; and to discharge himself from liability, it will be necessary to show a special contract to that effect; or that in addition to a separate note being taken for the amount of the debt, the original bills were given up.   And even when that is the case, it may be rebutted by countervailing proof that it was otherwise intended.   The auditors have reported that the counter notes or memorandums were retained by the creditors; and they were warranted in coming to this conclusion, as the presumption was, that they were in the possession of Lewis Desauque, the payee of the bills, and that they did not come into his possession as the assignee of Davis & Desauque. If the latter was so, it was incumbent on the appellants to prove it; which might have been readily done by the testimony of F. Desauque.

A partnership may be dissolved by the act of God, by the act of the party, and by the act and operation of law.   This partnership was dissolved by an agreement, the particulars of which are not stated; Davis quitting the concern, leaving Desauque in possession of the store and stock, with a general authority to wind up the business of the firm.   As a general principle, when a partnership is ended in any of the modes mentioned, no one of the partners can make use of the partnership estate, in a manner inconsistent with the settlement of the joint estate.   The object of the association having terminated, it follows that one of the partners cannot create any new obligation binding the firm; for after a dissolution nothing remains to be done, except to arrange the affairs of the partnership; but until they are finally arranged, the connection between the par-

ties subsists; and for this purpose, and until a settlement takes place, the partnership continues.

There are various ways of dissolving a partnership: affluxion of time; the death of one partner; the bankruptcy of one, which operates like death; or a dry naked agreement that the partnership shall be dissolved. In no one of these cases can it be said, that to all intents and purposes the partnership is dissolved; for the connection still remains until the affairs are wound up. The representatives of a deceased partner, or the assignees of a bankrupt partner, are not strictly partners with the survivor or the solvent partner; but still, in either of these cases, that community of interest remains, that is necessary until the affairs are settled. *Peacock* v. *Peacock*, (16 *Vesey*, 57.)

When a partnership is dissolved by agreement, the partner to whom is committed the power to settle the estate, may be limited, or the most full and ample authority may be given to him; but the question here, is, as to the extent of the authority of the acting partner, in relation to the assets, in the absence of all express limitations or restrictions. In general to him is given all power which may be necessary for the final settlement of the concerns. He cannot enter into any new obligation, but his authority extends only to those contracts which may be consistent with the trust. Is then, the borrowing of money, for the express purpose of paying the debts of the firm, and the application of it to that purpose, within the scope of the implied power of the acting partner? And we are of the opinion, that where the credit is given in good faith to the firm, although the partnership may have been dissolved, and where the proceeds are faithfully applied to the liquidation of the joint debts, the creditor has a claim against the firm, and is not to be considered a creditor, merely, of the partner who negotiates the loan for the benefit of the estate. And to this implied power I perceive no plausible objection. Cases may be readily supposed, where the exercise of such an authority may be highly expedient—nay absolutely necessary,—for the preservation, of the rights of the creditors, and of the partners themselves; as where money is borrowed to relieve the estate from the pressing demands of a creditor who may urge the sale of the assets, to the injury or the absolute destruction of the estate. It may very well happen that money may be raised by a pledge of the partnership credit, which could not be obtained on the credit of the acting partner. He may pay the debt out of his own private funds, if he chooses; but when he has not means, why may he not avail himself of the aid of others, or obtain an extension of credit by a renewal of the note?

The case of *Abell* v. *Sutton*, (3 *Esp.* 108,) is cited in opposition to this. If that case is to be understood as ruling the general principle, that after a dissolution of the partnership, the person who has authority to settle the partnership affairs cannot enter into any new

obligation or create any new debt or liability, there can be no objection to it. But here there is no new debt or obligation created. The responsibility of the firm is precisely the same; and the only alteration is, as to the person of the creditor. With every respect to the opinion of the learned judge who decided that cause, I do not see the force of the reasons on which that case was' ruled. Lord KENYON says " that it never could be allowed that any one might make another his debtor against his will : by that means a man's greatest enemy, by paying his debt, might make himself his creditor." But this is a misapplication of a principle, which, to say the least of it, is itself of doubtful weight; for it is difficult to perceive the mischievous and' distressing. consequences which would ensue from permitting the acting partner to change the creditor of the firm, without altering, in the slightest degree, their responsibility. In truth, there is but little in the rule which prohibits a person from making himself the creditor of another, by payment of his debt. The time has gone by; even if it ever existed, when this power could be made an instrument of oppression. Besides, debts may be purchased without the assent of a debtor; and to all practical purposes the rule is of little value. I do not, however, intend by these remarks, to impinge the rule, but to object to its application. It is a fair inference from the whole of this transaction, that the loan was made and the money advanced on the credit of the partnership. In the absence of express proof of a separate contract, the application to partnership uses of money borrowed by one partner, is evidence to show that the debt is joint. And the principle applies, as well after, as before the dissolution of the partnership. *Exparte Bonbonus*, 8 *Ves.* 540. There is so much justice in making the firm which receives the money pay the creditor, *qui sentit commodum sentire debit et onus,* that we feel disposed to seize hold, even of slight circumstances, in addition to the receipt of the money, to raise the implied contract, and to infer that the loan was made to the firm, and not on the credit of the individual partner.

But conceding that the acting partner had not' power to borrow money on the credit of the firm, yet, inasmuch as all the money that was raised, went to the payment of the debts of the firm, a subsequent recognition of the act is equivalent to a previous authority. *Duncan* v, *Lownds,* (3 *Campb.* 478.) *Vere* v. *Ashby,* (10 *B. & C.* 288.)

In the assignment, Davis expressly recognises these as partnership debts, and provides for their payment; and this is nothing more than in justice he is bound to do. Nor does it follow, even admitting that the debts were the private debts of one of the partners, that they cannot provide for the payment, out of their joint estate, to the extent of his interest in the assets, to the exclusion of joint creditors. The doctrine of marshalling assets, applies where

(Estate of Davis & Desauque.)

property is seized on an execution, or in cases of insolvency or bankruptcy, but not to a case like the present.

It only remains to consider the first exception.   The sale to Stork was a cash sale, and if the assignees chose to deliver the goods without exacting payment, it was on their own responsibility. When the debtor fails to pay, the assignees are *prima facie* chargeable with the debt, and can only discharge themselves from liability, by showing that the loss arose from circumstances over which they had no control; or by proof that the purchaser was of such undoubted credit, that no prudent person would have hesitated in trusting him with the possession without requiring payment previous to the delivery of the goods.  Here the whole matter seems to have been referred to the discretion of the clerk, and no extenuating facts are proved which can exempt them from responsibility.  Stork was in such doubtful credit, that Davis & Desauque refused to trust him before the assignment.

The decree of the Court, so far as it allows the assignees two hundred and ninety-two dollars and fifty cents, the value of the goods delivered to Stork, is reversed, and confirmed as to the residue.

Decree accordingly.